No. 98.—THOMAS PACE and others, propounders, plaintiffs in error, *vs.* JOHN MEALING, caveator, defendant in error.

[1.] When a rule nisi for a new trial is submitted to the Judge, by consent that he shall return his decision to the clerk, within twenty days, to be entered as the judgment of the Court, as of the Term when the motion was made : it is good notwithstanding it is not received until after the twenty days have expired.

[2.] A new trial will be granted when the verdict is strongly and decidedly against evidence, especially if there is reason to apprehend that the jury may have failed to make a proper application of the rule of law regulating the case to the testimony.

Caveat from Muscogee Superior Court. Tried before Judge WORRILL, at November Term, 1856.

The following paper was propounded for probate, as the last will and testament of William Pace, Senior, deceased. To wit :

GEORGIA, MUSCOGEE COUNTY :

In the name of God, Amen. I, William Pace, senior, of the county and State aforesaid, being in perfect mind and memory, but weak in body, and calling to mind the mortality of my body, and knowing that it is appointed for all men to die, do make and ordain this my last will and testament, as touching my worldly estate, wherewith it has pleased God to bless me in this life. I give and dispose of the same in manner as follows :

*Item* 1. I give my soul to God that gave it, and desire my executrix or executor, to have my body decently buried, that it may return to dust from which it came, according to the word of the Lord.

*Item* 2. I desire that all my estate, or that all my property of every description, remain in the hands of my wife, Polly Pace, during her life, and that she keep it together as it now is, and that as my just debts become due, that she pay them out of the profits arising from the same. At the death of my wife, I want the property, as I will it away, to fall into the

possession of those I will it to, and for them to take it into possession, and the balance of my estate, not willed away, of every description, to be sold by my executors at public sale, and the money arising from the sale to be equally divided among my living children, that is, them that is alive, when the sale takes place; I mean my sons only, to divide the money arising from the sale; and them only that are alive at the time.

*Item* 3. At the death of my wife, I give unto my son William Pace, Jack, Elick and Chany.

*Item* 4. At the death of my wife, unto my son Clement Pace, Joe, Tom and Burwell.

*Item* 5. At the death of my wife, I give unto my son Stephen Pace, Peter, Minger and Hanner, and one he had before.

*Item* 6. At the death of my wife, I give unto my son John Pace, Ned, Amy and her youngest child, Susan, and Sam he had before.

*Item* 7. At the death of my wife; I give unto my son Elkanah, Frank, Caty, Rose, Lewis and Philip, and Bartlett he had before.

*Item* 8. At the death of my wife, I give unto my daughter Elizabeth Weddington, one negro girl named Tildy, and her children, and Isham and Hester his wife, and the lot of land she lives on, including the house she lives in.

*Item* 9. At the death of my wife, I give unto Caty Mays' children, John Mays' first wife, deceased, Rose and her children, to be equally divided between Caty's children.

*Item* 10. At the death of my wife, I give unto my daughter, Polly May, Philis and her children, to be equally divided between Polly's children at her death. I also give unto Polly, my daughter, a negro girl named Lucy and Judy.

*Item* 11. At the death of my wife, I give unto my daughter Lucy Burt's two children, Martha and Mary, Dynah and her children, to be equally divided between them; and

if either of them should die without an heir of their body, I want the other to have the whole of the negroes.

*Item* 12. At the death of my wife, in addition to what I have given to my son Clement Pace, I give him one half of Lot number 243, the half to be laid off joining John Mullin's and Clement Pace's.

*Item* 13. At the death of my wife, in addition to what I have given my son Elkanah, I give him one lot of land joining him, number not recollected. I bought it of McClary, lying on the creek, below Elky's mill.

*Item* 14. I also appoint my wife, Polly Pace, executrix to this my last will, (alone) and at her death, I want and appoint each of my sons to have equal powers as executors, that is, my living sons at that time, and in witness hereof, I have hereunto set my hand and seal, this February 4th, 1847, in presence of us. I want Lany to live amongst my children; and for them to take care of her after the death of my wife.

WILLIAM PACE, [SEAL.]

To this will, John Mealing who had intermarried with one of the heirs at law of deceased, filed his caveat.

The Court of Ordinary pronounced in favor of the will as to the personal estate, but against it as to the realty, there being no attesting witnesses.

From this judgment, Caveator appealed, and upon trial by a special jury in the Superior Court, a verdict was rendered in favor of the propounders.

Upon error to the Supreme Court, this verdict was set aside, and a new trial granted, (*see* 14 *Geo. Rep., p.* 596.)

The case was again tried before Judge Worrill at November Term, 1856, and again the verdict of the jury was for the will.

Caveator moved for a new trial, upon the following grounds:

1st. Because the verdict is contrary to law and the evidence.

2d. Because the verdict is decidedly and strongly against the weight of evidence, and without evidence.

3d. Because the jury found contrary to the charge of the Court.

4th. Because the Court erred in overruling the objection of caveator to the 4th direct interrogatory propounded to Sarah Walker, and in admitting her answer thereto.

5th. Because the Court erred in overruling the objection to the 3d interrogatory propounded to Jacob Land, and in admitting his answer thereto.

6th. Because the jury found contrary to the following charge of the Court, that the paper propounded was an instrument which had an attesting clause, and being such, it was incomplete and unfinished, and could not operate as a will, unless the testimony showed that the testator had abandoned the intention of having it witnessed, and intended it to operate as his will, in that unfinished state; that it was exclusively a question of law, whether the will had an attesting clause, and that this was a testamentary paper, with an attestation clause.

Judge Worrill, after argument and consideration, set aside the verdict and granted a new trial.

To which decision of the Court, the propounders excepted, and assign the same as error.

### BRIEF OF EVIDENCE.
#### For Propounders.

The will, a copy of which is above set forth.

*Alexander H. Cooper, Esq.,* testified, that Mr. Pace, the deceased, was a shrewd business man, that he had business transactions with him, and that the signature to the will propounded is his genuine signature; that his mental capacity was as fully equal to the making of a will, as that of any man he ever saw, up to the last time he saw him, which was some four or five months before he died; that the word

*Chaney*, seemed to be interlined in the will propounded, with a different pen, but could not say that the interlineations of Chaney or Susan were in the hand-writing of old Mr. Pace ; that the ink had run in writing the word Susan, and he could not speak as to its being in the hand-writing of de-cedent, but *believed* that *Chaney* was in his hand-writing, it looked like it.

*James M. Chambers*, testified, knew William Pace, senior, (the deceased) in Putnam county, occasionally saw him here; should have thought Mr. Pace would have known the ne-cessity of witnesses to pass real estate by will or deed; he was a business man ; was a Justice of the Peace for a long time in Putnam county ; he thinks he occasionally acted for his neighbors in drawing up deeds and wills for them ; he was a man of such an order of business qualifications as would know the importance of witnesses to a will or deed to pass real property.

*Testimony of Mrs. Mary Pace, in behalf of propounders, by Interrogatories.*—To the first interrogatory, she answers : She knows the parties.

*Second Interrogatory.*—Please state whether you freely and fully sign the release hereto annexed, and whether, after signing and sealing the same, you have any interest, either directly or indirectly, in the event of this suit, or in the es-tablishment of the last will and testament of your late hus-band, William Pace, senior, deceased, or in his estate, with or without said will ?

*Answer.*—To the 2d interrogatory she answers : I freely and fully, of my own accord, sign the release referred to. I have no interest either direct or indirect, in the event of this suit ; neither have I, in the establishment of the last will and testament of William Pace, lately deceased, or in his estate, with or without said will.

*Interrogatory Third.*—Please look upon the original pa-per hereto annexed, purporting to be the last will and testa-ment of said William Pace, senior, and state all you know about it ?

State in whose hand-writing it is, and whether you are acquainted with the hand-writing, from having seen the party write?

State if you know when and where it was written, and all the facts and circumstances by which you are enabled to state the time and place?

*Answer to Interrogatory Third.*—I have examined the paper referred to, and know it to be the will and wish of my late husband, William Pace, senior, that his personal estate should be bequeathed, as stated in said will. It is in the hand-writing of my late husband, and I know it to be the last will he made. The will referred to, was written in the month of July or August—about the last of July or the first of August, in the year 1850. It was written at his residence in Muscogee county.

*Interrogatory Fourth.*—Look, particularly, upon the interlineations in said will, and state in whose hand-writing they are, and all you know about their being made, and why they were made?

*Answer to the Fourth.*—I have examined said will, and the interlineations, and it is the hand-writing of my deceased husband. I saw him write the name of Chaney, in the place of Laney, whose name was first written in the body of the will, and he done it at my suggestion. After he had written the will, he called me up, (I was lying down,) and read it over to me, and wished to know if I was satisfied with it. I stated that as Laney was old, I would prefer her to stay with the children, instead of being sent to Alabama, the place where William Pace, Jr., resides, and requested him to do so; and he then made the erasure, and wrote the name of Chaney in lieu thereof; and as Laney was old and had been a faithful servant, requested, in his will, that his children should take care of her, after my death.

*Interrogatory Fifth.*—Look upon the names of the negroes mentioned in said will, and state if any of them, and which of them, were born since February, 1847. and when

such negroes were born, and how you know the time when they were born?

*Answer to Interrogatory Fifth.*—The negro girl Chaney, was born in August 1847 ; the negro girl Susan was born in the month of May, 1849. I know these facts from a private record kept by my late husband, of the births of his negroes ; also from the fact of the marriage of my grand-daughter, Nancy Pace.

*Interrogatory Sixth.*—Relate all you know or remember, in relation to said will, hereunto annexed, that will go to show that it is the last will and testament made by your husband, and that he was of sound and disposing mind and memory, when he made it ?

*Answer to the Sixth.*—I know that the paper referred to is the last will and testament of my late husband, from the facts stated in my answer to the fourth interrogatory; and I am fully assured that at the time the will referred to was made, my late husband was of a sound mind and memory, and well understood what he was doing; and from my long acquaintance with him, and his individual affairs, he showed no want of his usual memory, up to the time said will was made.

*Cross Interrogatories.*—*First Interrogatory.*—At whose instance or persuasion do you sign the annexed release, and what is the understanding under which you do so ? State fully.

*Answer to the First.*—I signed the release at the persuasion of no one, but of my own accord, as stated in my first answers. There is no understanding with any person about signing the same.

*Second Interrogatory.*—In whose hand, and where did you first, after his death, see said paper writing, purporting to be the will of William Pace ? How long after his death was it that you first saw said paper writing? Did you see the same or any part of it written ?

*Answer to the Second.*—Three days after the death of my

husband, the will referred to was found in the desk of my late husband, and was taken out, I think, by Jesse Cox, Esq., and a part was then read by him.   I saw it wrote, as stated in my direct answer.

*Third Interrogatory.*—Why did said William Pace so dispose of property?   Why did he not make all of his children equal in the division of it?   What prejudice had he against the children of his deceased daughter, formerly wife of James G. Burt?   Was he not desirous of putting them as nearly as possible upon the same footing with his other heirs?   What did he say about this, and when and how came he to say so?

*Answer to the Third.*—William Pace, senior, my late husband, made this disposition of his property, because it was his will and wish to do so.   He had given others property before and said he had given them all he intended to give them; he had no prejudice against the children of James G. Burt; and it will appear, by reference to the annexed will, that they have received some ten negroes; and he considered them provided for, and said he should give them no more.

*Fourth Interrogatory.*—Was said William Pace disposed to prefer some of his children to others, and if so, what was the occasion of his dislike of the children of said daughter?

*Answer to the Fourth.*—I do not know that my husband was disposed to show any preference to some of his children over others, neither was there any dislike, that I know of, to the daughters of Mr. James G. Burt, his grand children.

*Fifth Interrogatory.*—When was the word " Chaney" interlined in said writing? how long after the rest was written? and relate all you know to benefit caveator, &c.

*Answer to the Fifth.*—I have already answered that question in my direct answer.   I have stated fully all I know.

                                          her
    (Signed)                    MARY ⋈ PACE.
                                         mark.

*Release, attached to interrogatories.*

GEORGIA, HARRIS COUNTY.

These presents witness that I, Mary Pace, widow and relict of William Pace, senior, late of Muscogee county, deceased, do hereby, for the consideration of one dollar, as well as for and in consideration of the love and affection which I bear my children, who are legatees under the last will and testament of said deceased, do hereby relinquish all manner of right and claim which I may have on the personal estate and property of said deceased, either under his last will and testament, or otherwise; and do likewise hereby renounce all claim and right to administer said estate as executrix, next of kin, or otherwise; and all manner of interest, either as executrix, or heir, or legatee, in the said personal property, left by said deceased, whether embraced in said will or not,

In witness whereof, I have hereunto set my hand and seal, this 11th day of April, 1851.

her<br>
MARY ⋈ PACE, [SEAL.]<br>
mark.

Signed and sealed in presence of

  MICHAEL N. CLARKE,
  JESSE COX, J. P.

*Amanda Weddington*, testified in behalf of propounders, by interrogatories, as follows:

To the first interrogatory she answers, she knows the parties.

*Interrogatory 2.*—Are you acquainted with a negro woman by the name of Amy, the property of William Pace, senior, in his life-time, and her children? If yea, how many children has she? What are the names of the two youngest, and how old are they? When were they born?

*Answer.*—I know a negro woman named Amy, that was the property of William Pace, senior, during his life time. I also

knew her children. She has five children, viz: Lucy, Burwell, Hannah, Chany, and Susan. Chany and Susan are the two youngest. Chany was born about the last of August, 1847. Susan was born in the year 1849. I do not recollect the time or month she was born, but think it was in the month of May.

*Interrogatory* 3.—Relate all you know that will benefit the propounders of the will.

*Answer.*—To the third interrogatory she answers, I know nothing more.

*Cross Interrogatories.*—1. Are you not interested in having said alleged will established? How long have you known the negroes mentioned in the direct interrogatories? What means have you had of knowing them and their ages?

To the cross interrogatories, she answers as follows: I am not interested in having said will established. I have known Chany and Susan from the time of their birth. The means I had of knowing them, was by frequently seeing them at Wm. Pace's, senior, my grand-father, and from that circumstance, recollect the years they were born.

*F. W. Pleasants.*—Frederick W. Pleasants, in behalf of propounders, testified by interrogatories, as follows:

To the first interrogatory he says, he knows the parties.

*Interrogatory* 2.—What is your profession?

*Answer.*—I am a medical practicing physician.

*Interrogatory* 3.—Were you acquainted with William Pace in his life-time? Do you believe he had mental capacity to attend to ordinary business? State your opinion and belief, and your reasons for it?

*Answer.*—I was acquainted with him. I do. I was frequently in conversation with him, and he reasoned well on all subjects that we conversed about.

*Interrogatory* 4.—Did you have any conversation with said William Pace, a short time before his death, about his will; and his intentions, as to any of his children or grandchildren? If yea, state what he said about having such or

any will; and which, if any or either of said children or grand-children, he did not intend to give anything more than he had formerly given them? How long before his death was such conversation?

*Answer.*—To the fourth interrogatory he answers: I did have a conversation with him about his will, on Friday before he died on Sunday, and he stated he had his will written, and also said, he had two daughters, that was dead, and James Burt had married one, and a gentleman named May, had married the other; and that he did not intend that their children should have any more of his property, than had been given to their mothers at their marriage. This conversation was on Friday, before he died on Sunday.

*Interrogatory 5.*—Relate all you know that will benefit plaintiffs.

*Answer.*—I know nothing more.

*Cross Interrogatories.*—1. Do you, in detailing any conversation with said William Pace, senior, state his words? Please give his language as nearly as you can. How long before the death of Mr. Pace was said conversation referred to? Where was it, when, and who was present?

*Answer.*—I have stated his words in language in the fourth direct interrogatory, as near as I can. It was at Zeno Weddington's, out at the horse block. It was on Friday before he died on Sunday. There was no person present but myself.

2. Did or did not said Pace speak of his will, if at all, as imperfect, neither proven nor published; and did he or not express himself not fully satisfied with the disposition he had proposed of making of his property? What did he say on this point? Did he not say he was in doubt how best to dispose of it, or something to that effect? and that he either had made or intended to make an equal distribution of his property? Declare fully.

*Answer.*—He said nothing on these subjects.

3. What property did he say he had, by said will, given to the children or grand children who were to be cut out?

*Answer.*—The property which was given at the marriage of his daughters.

4. Did he speak of said will as one *already made*, or one he *intended to make?*

*Answer.*—He spoke of one already made.

*Sarah Walker.*—Sarah Walker testified, in behalf of the propounders, by interrogatories, as follows:

To the first interrogatory she answers, I do know the parties.

*Interrogatory 2.*—Do you know a negro girl child named Susan, of which William Pace, late of said county, deceased, died possessed? If yea, when was the child born? What was her age at the time of the death of said Pace? Whose child is the Susan of which you speak? Was it the last child of its mother at the death of said Pace?

*Answer.*—To the second interrogatory she answers: 1st, I do. 2d, I do not know. 3d, I suppose it was eight or nine months old. 4th, Amy. 5th, It was.

*Interrogatory 3.*—What are your means of knowing the facts to which you testify in this case?

*Answer.*—I was living with said Pace at the time of his death, heard him and the family say that the child was Amy's, and saw it suck her.

*Interrogatory 4.*—Have you heard said William Pace, deceased, say that his intention was not to give any more property to a portion of his sons-in-law, than he had already given them? If yea, which ones were they? When and where did you hear him speak of it, and what did he say on that subject?

*Answer.*—To the fourth interrogatory she answers: 1st, I did. 2d, James Burt and John May. 3d, In his house, about a month before his death.

*Cross Interrogatories.*—1. Are not you and your husband living at this time with Elkanah Pace? Where have you

lived since the death of William Pace? Were you present when Susan was born? Where were you at that time? How do you know which was the last child of any of said William Pace's slaves, and especially the last one of the mother of Susan? When did you hear William Pace say any of the things which you are asked about in the direct interrogatories? Where did you hear him say it? Who was he talking to at the time? Who was present at the time? When did you first tell anybody about what you heard him say? Who did you first tell? What made you tell? Who was present when you told?

*Answer.*—She answers: 1st, We are. 2d. At John Pace's, Larkin Davidson's, Elkanah Pace's, James Biggers', and Elkanah Pace's. 3d, I was not. 4th, I suppose I was in the city of Columbus about that time. 5th, I never saw or heard of any other. 6th and 7th, About a month before his death, in his house. 8th, His wife and me. 9th, His wife and me. 10th, At Mr. Elkanah Pace's. 12th, I and her, (Mrs. Pace), was in conversation about the law suit, I recollect to have heard him, the said William Pace, deceased, say so, and I told her. 13th, No person but Mrs. Pace and me.

*Interrogatories of William M. Perry and Jacob Land.*— To the first interrogatory, they say they know the parties.

*Interrogatory 2.*—Were you acquainted with William Pace, senior, in his life-time? How long did you know him? How far did you live from him, and what were your opportunities of knowing him well? Especially as to his good mind, and capacity to attend to business of any sort?

*Answer.*—To the second interrogatory, they answer we were. 3d interrogatory, Wm. M. Perry answers twelve years; Jacob Land answers ten years. 4th, William M. Perry answers between four and five miles, and being a member of the same church, and being frequently in his company during eleven years previous to his death, I believed him to be capable of attending to his own business. Jacob Land answers one mile and a half, and being frequent-

ly in his company, and having him to write a bond for titles to land, and also to write a deed for land, I believe he was of sound ———————— as any body to the day of his death.

*Interrogatory* 3.—State whether, at any time during your acquaintance with him, he had other than a sound and disposing mind and memory, and give all reasons for such belief as you express.

*Answer.*—To the third interrogatory they answer: We never knew him to have other than a sound and disposing mind. Our views and reasons are given in the above interrogatory. We have stated above how long we were acquainted with William Pace, and part of the time he was an official member in the M. E. Church, class-leader and exhorter, and he being frequently called on to write bonds and deeds, &c.

*Cross Interrogatories.*—1. Who is, and has been present with you before the Commissioners, at the time of your examination upon these and the direct interrogatories?

*Answer.*—To the first interrogatory they answer: No person in the house but the Commissioners.

2. Do you know anything which will benefit the caveator? If you do, tell it.

*Answer.*—To the second interrogatory they answer, we know nothing.

*Jacob Land* testified, by interrogatories: That he never heard Mr. Pace mention his will. That he had heard him speak of the disposition of his property after his death—that his business should be so arranged that there should be no wrangling after his death. He also said as to his land, he intended that all of it should be sold at his death. This conversation took place about a month before his death, whilst tracing the line of a lot of land lying near where I reside, and which I was endeavoring to purchase from him. Knows nothing further that would benefit propounders.

*Cross Examined :*—Did say to Newton Pruett that I knew nothing of old man Pace's will, nor did I wish to know, as it

did not interest me, and I never heard old man Pace mention it. I did say old man Burt's children were as much entitled to their proportion as any one of them provided there was no will established. Knows nothing further that would benefit caveator.

*Jesse Cox* testified : Supposed that he first saw the will at Mr. Pace's in February, 1851 ; he died Sunday evening ; on Tuesday morning after, he supposed, he found it, the will propounded, in his, Mr. Pace's drawers. Don't think he read it, and no body else read it in his presence. They were reading wills, but he does not know who, nor how many. Thinks they found some papers similar to the one propounded. They found several wills—some witnessed and some not. · Was asked to examine and join in the investigation amongst the papers of Mr. Pace, deceased, for a will. John Pace asked him to examine the papers. The object seemed to be to search for a will. Did'nt think they found any paper that was the will of Mr. Pace, from the fact that they were not witnessed. That was his notion. His notion was that it was not a will without being witnessed. Some of these papers were read—witness did not read any one, though, except one that was commenced but not finished. Old Mrs. Pace was present. Don't remember that she recognized any one of the papers as the will. In their examination they examined all the papers they supposed large enough to contain a will; some small papers they did not examine. They found a good many papers ; thinks it pretty likely they found the will propounded, but is not positive. Cannot say that he is acquainted with the hand writing of Mr. Pace, deceased, from having seen him write. The one he commenced reading is the one not signed. It was supposed after they failed to find a will that there was one here in town, in the hands of the Clerk, or of Judge Alexander. Clement Pace was the one who supposed there must be another will. Elkanah and John Pace went off in search of, a will. Clement Pace said he went over there, (that is to the

house of old Mr. Pace), the night the old man died; in the evening he found the back door open—he went to the drawers and found them unlocked, and so stated to witness, and said he found all things as witness then saw them.   The money was scattered about in the drawer, and so also were the papers—there was some paper and some silver money.

*Re-examined :*—No person told him that every thing was as it remained when the old man died; no one said any-thing about it but Clement Pace.   Cannot say for certain they found there any one of the papers (the five wills in evi-dence, including the one propounded,) shown witness. Don't think he ever testified that he found the will propoun-ded, with four others; he has stated that it was his opinion that he did.   Was magistrate for the district at the time.

*Dudley Willett* testified, that he had some conversation with Mr. Pace, deceased, the fall before he died, about the last of October, 1850.   In speaking about, he informed wit-ness that he had arranged his business to his own liking. Witness never knew anything about a will, but Mr. Pace said he had fixed up his business as he wished it to be—he never said anything about any disposition of his negroes, only that he had made his arrangements as he wished it to go.

*Joshua L. O. Davis* testified that he had a conversation in the fall or winter of 1850, in November or December he went to him to get off from being overseer, the conversation then arose.   He (Mr. Pace, deceased,) then stated to witness that his negro property would not fare so well after his death; as it was then faring; he then stated that he had his business arranged and fixed so that his children would understand it after his death, and settle without any difficulty, if they would not be contentious.

*Hardy May.*—Testimony of Hardy May in behalf of pro-pounders, taken by interrogatories.

To the 1st he answers : He knows the parties.

*Interrogatory* 4.—Are you acquainted with a negro wo-

man by the name of Amy, the property of William Pace in in his life-time? If you are, state if you know when her child Chany was born, and also her child Susan. How many children has Amy, and which are the names of her youngest?

*Answer.*—I am well acquainted with a negro woman named Amy, the property of Wm. Pace, senior, deceased. Her child Chany was born in the month of August, 1847. I do not recollect at which time Susan, the youngest was born.

*Interrogatory* 5.—Relate all you know that will benefit the propounders of the will.

*Answer.*—I know nothing more.

*Cross Interrogatories.*—Are you not interested in having the said will established? How long have you known the negroes mentioned in the direct interrogatories? What means have you had of knowing them and their ages?

*Answer.*—I have no interest in having the will established. I have known Amy for the past seventeen years, and have lived at different periods, in that time, with William Pace, some five years, and this is the means I have of knowing Amy and her children.

*Evidence for Caveators:*

*Joseph Dent* testified, that he went to Mr. Pace's, deceased, to buy a stack of oats, he engaged them, and he and the old man went on down to the lot, and going along, he told the old man that he would not pay for the oats for a few days; the old man replied, "well Joe, don't let it be long; I shall not live long and don't want to leave any unsettled business behind. I have made my will and had it executed. I have fixed my business as I have wished it to go. I have not made my will as your father did his, if you had been disposed to be contrary, you could have broken your father's will to atoms, into one thousand or ten thousand pieces, (witness could not say which) and you had to have an ad-

ministration as to your father's land any how; that he knew that his boys were contentious, and that he had fixed his business so that there could be no mistake after his death."

*Timothy G. McCrary* testified, he was at the house of old Mr. Pace deceased, the day before he died on Sunday; (witness understood he died at that time;) witness knowing that the old man had some unruly negroes, remarked to him, it would be best to give off his negroes to his children to his satisfaction; the old man said he was at a loss to know what disposition to make of them, to do right and to do justice.

*Mrs. Mary Pace*—Testimony taken by interrogatories, was read, and is as follows:

To the first interrogatory she answers, she knows the parties.

*Second Interrogatory.*—Have you testified before by interrogatories in this case, in behalf of said propounders, with reference to the paper writing propounded as the last will and testament of William Pace, deceased.

*Answer.*—To the second interrogatory she answers, I have.

*Third Interrogatory.*—Did you or not, upon a certain occasion, at the reading of said paper writing, on Tuesday, next day after the burial of said William, at his (then) late residence, in presence of Richard Dent, James G. Burt, Jesse Cox, and perhaps others, say, upon the reading of said paper writing: "It is not the will the old man read to me," or words to that effect? If yea, whom did you mean, by the words "old man"?

*Answer.*—To the third interrogatory she answers: I don't recollect of coming over any such words as therein named, or to the same effect, and do not recollect naming "old man" on the occasion, as I was not in the habit of calling Mr. Pace "old man."

*Fourth Interrogatory.*—Did you or not, then and there also, in the same company, and more particularly in the presence of Richard Dent, James G. Burt and others, say that "he" (meaning said William) "had left all his business un-

settled", or words to that effect, and relate all you know to benefit caveator.

*Answer.*—To the fourth interrogatory she answers: I did not say he, Mr. Pace, left his business unsettled, and I have nothing more to say that will benefit the caveator.

*Cross Interrogatories.—First Interrogdtory.*—If upon any former occasion, you have been examined as a witness, in this case, please say, if your evidence then given, as to the identity of the last will and testament of William Pace, senior, deceased, was correct, and repeat your reasons for so saying, or your evidence as then given.

*Answer.*—To the first cross interrogatory she answers: My evidence given on a former occasion in this case, is correct: and my reasons for saying so are these: One night, late in the year one thousand eight hundred and fifty, Mr. Pace took his candle and sat down and wrote until I became tired and lay down. After some time, he spoke to me, and asked me if I was awake, and told me to get up and he would read to me what he had been writing. I got up and sat down by him, and he read this will over to me twice, and asked me how it would do? and I said to him, I suppose that is your wish? He said that it was, and I told him that it would do very well, but one thing, that is, Lany is there given to William, who lives in Alabama, and I do not want her to go there; so he immediately, according to my wish, put out Lany and inserted Chany in her place; and then disposed of Lany otherwise in the latter part of the will.

*Second Cross Interrogatory.*—If you made any such expression as inquired of in the third direct interrogatory, please state whether it was made in reference to the paper writing, which you formerly testified was the last will and testament of William Pace, deceased, or some other will which was then read?—Were not several papers read, and when the true and last will was read, did you not recognise and re-

member it as the paper which your husband had last read to you, as his last will and testament?

*Answer.*—To the second cross interrogatory she answers: I do not recollect of making any such observation as asked in the third direct interrogatory. There was several papers read in my hearing, but when the last will was read to me, I knew it, for the reasons I have stated in the first cross interrogatory.

*Third Cross Interrogatory.*—If you made any allusion to your husband having left his business unsettled, please state fully what you intended thereby.

*Answer.*—To the third cross interrogatory she answers: I do not recollect saying, on that occasion, that my husband left his business unsettled.

*Fourth Cross Interrogatory.*—Relate all you know that will benefit the propounders of the will.

*Answer.*—To the fourth cross interrogatory she answers: I have related all I know that will benefit the propounders of the will.

*James G. Burt* testified, that he married a daughter of old Mr. Pace, deceased, in 1828, when the old man gave him the negro girl named in the will propounded, *Dinah,* then about fifteen years old; since, she has had some six or eight children; his wife had died before the death of Mr. Pace, deceased. He was at the old gentleman's the Tuesday after his death in company with other persons, examining amongst the old man's papers for a will; was sitting by Stephen Pace, as near as they could set together in chairs. Old Mrs. Pace stood behind them with one hand on the back of each and attending to the reading of the will propounded; Stephen Pace was reading it aloud, and witness was looking over reading along after him, they had read down some two-thirds of the first page, when Mrs. Pace exclaimed, "this is not the will the old man read to me that night;" knows it is the will propounded; knows it, because of the interlineations. There was some six wills found,

Thomas Pace, et al. vs. John Mealing.

some was proven—had witnesses; the others had no witness-es. Being shown four other papers, purporting to be wills, besides the will propounded, witness testified that they were all in the hand writing of old Mr. Pace.

*Cross Examined.*—The old man Pace gave witness a young negro woman after his marriage, who had bred six or eight children.

*Richard Dent* testified that he was present at the examination of the deceased Mr. Pace's papers, on the Tuesday after his death. Old Mrs. Pace asked was there a will ? Some one said there was no will proven. Mrs. Pace, exclaimed, poor old creature, he must have been deranged to leave his business in such a fix. While the will propounded was being read, the old lady said "this is not the will the old man read to me that night; that will cut out Stephen Pace, and this will (then being read) won't do; could'nt say positive, but thinks the will propounded is the will then read, when the old lady made that remark.

*Re-Examined.*—It was the will the old man read that night that cut out Stephen as the old lady said. Stephen Pace was reading the will propounded, when the old lady made the remark.

*Copies of the Wills of William Pace, (deceased,) introduced in evidence.*

In the name of God—Amen. I, William Pace, of the county of Putnam, and State of Georgia, being very sick and low in body, but in perfect mind and memory, thanks be to God for it, calling to mind the mortality of my body, and knowing that it is appointed for all men once to die, do make and ordain this my last will and testament, and touching my worldly estate wherewith it has pleased God to bless me in this life, I give and devise and dispose of the same in manner as follows:

*Item 1st.* I give and bequeath to my daughter, Elizabeth

Weddington, one negro girl named Tildy, for her peaceably to possess.

*Item 2d.* I give and bequeath to my daughter, Polly May, one negro girl named Fillis, and her two children, for her peaceably to possess.

*Item. 3d.* I give and bequeath unto my daughter, Catharine May, one negro girl named Rose, and her two children, for her peaceably to possess.

*Item 4th.* I give and bequeath to my daughter, Lucy Burt, one negro girl named Dinah, and her two children, for her peaceably to possess.

*Item 5th.* I give and bequeath unto my son William, three hundred dollars, which he has received.

*Item 6th.* I give and bequeath to my son, Clement, three hundred dollars, which he has received.

*Item. 7th.* I give and bequeath to my son, Stephen, three hundred dollars, which he has received in a negro.

*Item 8th.* I give to my son John, one half of a certain lot of land I bought of Smith Scrogin, No. 327, and a certain bit on this side of the creek, willed to me by my father, I suppose about eight or ten acres. I also give unto John, the house where I formerly lived, and the land below the old -path leading from Mrs. Terrill's to the meeting house, and all to the left of said path and road, to-wit. till it comes to the side of the hill above the spring to the old road leading to Holt's Ferry, including the houses and open land round the house and springs where I used to live, called my old place; one negro man named Jack, one filly called Beck, one feather bed and furniture, one cow and calf, one sow and pigs; and leave it in the power of my wife to give him house furniture and tools.

*Item 9th.* I give unto my son Elkanah, at the death or marriage of his mother, the house and land where I now live, deeded to me by my brother, Hardy Pace, with all its appurtenances, Nos. 314, 315, in three pieces, containing one hundred and seventy-six acres, be the same more or less;

also, the land lying to the right of the road leading from where I now live, to Garner's ferry, down to Mrs. Terrill's path, thence with said path to the corner of the fence to the road leading from where I live to the meeting house, thence with said road to the beginning. Also, at my death, I give unto Elkanah, one negro boy named Bartlet, one horse, saddle and bridle, worth one hundred and twenty dollars, one feather bed and furniture, one cow and calf, one sow and pigs; and leave it in the power of my wife to give him house furniture and tools.

*Item* 10*th.* I give unto my wife Polly Pace, during her natural life or widowhood, the use of the house and land, where I now live, with all the rest of my lands not willed away before, and house and furniture, and stock of every description whatever, for her peaceably to possess during her natural life or widowhood, and at her death or marriage, I give unto my nine children, as follows:

*Item* 11*th.* I give unto my son William, one negro named Isham.

*Item* 12*th.* I give unto my daughter Elizabeth Weddington, one negro boy named Frank.

*Item* 13*th.* I give unto my daughter Polly May, one negro boy named Tom.

*Item* 14*th.* I give unto my daughter Catharine May, one negro boy named Ned.

*Item* 15*th.* I give unto my daughter Lucy Burt, one negro boy named Mingo.

*Item* 16*th.* I give unto my son Stephen, one negro boy named Peter.

*Item* 17*th.* I give unto my son John one negro woman Hester.

*Item* 18*th.* I give unto my son Elkanah, one negro girl named Chany.

*Item* 19*th.* I give unto my son Clement, one negro boy named Sam, and a certain piece of land joining him on the

other side of the creek, supposed to be four acres and a quar ter, I bought of my brother Hardy Pace.

*Item 20th.* I give unto my wife, Lany and Joseph, or Arter, for her to dispose of amongst my children, as she thinks proper, at her death; and she is at liberty, and can, at her option, give to either or all of my nine children, the negroes last willed to them, when she is so minded.

*Item 21st.* At the death or marriage of my wife, I want all the rest of my property, not disposed of, to be equally divided between my nine children.

*Item 22d.* I also want all my just debts to be paid as they come on demand, out of my present crop, and the debts owing to me; and if either of the children should die before they receive the property left to them, I want their property equally divided between the others alive; and if either of their negroes should die before they receive them, I want them to have another of equal description, of the balance of my estate not willed away.

*Item 23d.* I also give unto my son Elkanah, at the death of his mother, the balance of the lot of land I bought of Jerry Edgot, not before willed to him and John.

*Item 24th.* I also appoint my wife, Mary Pace, executrix of this my last will. In witness whereof, I have hereunto set my hand and seal, this April the 30th, 1832, in presence of

JOSEPH MORELAND,
JOSEPH MOSELEY,        WILLIAM PACE, [SEAL.]
DAVID T. WHITE.


*Copy Will of William Pace, Senior.*

GEORGIA,        } In the name of God, Amen. I, Wil-
Muscogee County. } liam Pace, senior, of the county and State aforesaid, being in perfect mind and memory, but weak in body, and calling to mind the mortality of my body, and knowing that it is appointed for all men to die, do make and ordain this my last will and testament, as touching my world-

ly estate, wherewith it has pleased God to bless me in this life. I give and devise and dispose of the same, in manner, as follows :

*Item* 1*st.* I give my soul to God that gave it, and desire my executrix, or executors, to have my body decently buried, that it may return to dust from whence it came, according to the word of the Lord.

*Item* 2*d.* I desire that all my property, of every description, remain in the hands of my wife, Polly Pace, during her life, and that she keep it together, as it now is; and as my just debts come due, that she pay them out of the profits arising from the same. At the death of my wife, I want the property, as I will it away, to fall into the possession of them I will it to, and for them to take it in possession; and the balance of my estate, not willed away, of every description, to be sold by my executors, at public sale, and the money arising from the sale, to be equally divided among my living children; that is, them that are alive at the time when the sale takes place.

*Item* 3*d.* At the death of my wife, I give unto my son William Pace, a negro man named Jack, and Frank, and Ellick.

*Item.* 4*th.* At the death of my wife, I give unto my son Clement, one negro man named Tom, and Joe a man, and Lucy a girl.

*Item* 5*th.* I give unto my son Stephen, a negro man he has had, and Peter and Burwell.

*Item* 6*th.* I give unto Elkanah Pace, at the death of his mother, Bartlett a man, and Caty a girl, and Rose a girl, and two boys, Lewis and Phillip.

*Item* 7*th.* At the death of my wife, I give unto my son John, Sam a man, and Amy a woman, and her youngest child.

*Item* 8*th.* I give unto my daughter Betsy, or Elizabeth Weddington, at the death of my wife, a negro girl named Tildy, and her children; and Isham and Hester, and half of

the lot of land she lives on, including the house she lives in.

*Item 9th.* At the death of my wife, I give unto Caty May's children, John May's first wife, deceased, Rose and her children, to be equally divided between Catharine's children.

*Item 10th.* At the death of my wife, I give unto my daughter Polly May, Fillis and her children, to be equally divided between Polly's children; and at her death, I also give unto Polly a negro girl, her life-time, named Judy; and at her death, I give said negro Judy to William May, Polly's son, and her increase.

*Item 11th.* I give unto my daughter Lucy Burt's two children, Marty and Mary, Dinah and her two children, to be equally divided between them; and if either of them should die, without an heir of their body, I want the other to have all of the negroes.

*Item 12th.* I also appoint my wife, Polly Pace, executrix of this my last will, (alone,) and at her death, for each of my sons to have equal power as executors; that is, my living sons at that time; in witness whereof, I have hereunto set my hand and seal, this February 4th, 1847, in presence of us.

WILLIAM PACE, Sr. [SEAL.]

I also give unto my son Elkanah Pace, a negro man named Mingo, by his paying unto my estate four hundred dollars, twelve months after the death of my wife; and I also give unto my son John Pace, a negro girl named Hannah, by his paying to my estate one hundred dollars, twelve months after the death of my wife. I also desire that Lany, after the death of my wife, live amongst my children, when she thinks proper. This given under my hand and seal, this February 4th, 1847, in presence of us.

WILLIAM PACE, Sr. [SEAL.]

*Copy Will of William Pace, Senior.*

GEORGIA,    }   In the name of God, Amen. I, William Pace, senior, of the county and State aforesaid, being in perfect mind and memory, but weak in body, and calling to mind the mortality of my body, and knowing that it is appointed for all men to die, do make this my last will and testament, as touching my worldly estate, that it has pleased God to bless me with in this life. I give and dispose of the same in manner as follows:

*Item 1st.* I give my soul to God that gave it, and desire my executor, to have my body decently buried, that it may return to dust from which it came, according to the word of the Lord.

*Item 2d.* I desire that all my property of every description whatever, remain in the hands of my wife, Polly Pace, during her natural life, and that she keep it together as it now is, and as my just debts become due, that she pay them out of the profits arising from the same. At the death of my wife, I want the property, as I will it away, to fall into the hands of them I will it to, and for them to take it in possession, and the balance of my estate, of every description, not willed away, to be sold by my executors at public sale, and after paying my just debts, or the debts of my estate, to be equally divided between my living children; I mean them that are alive at that time, when the sale takes place.

*Item 3d.* At the death of my wife, I give unto my son William Pace, one negro man named Jack, and one boy named Frank.

*Item 4th.* At the death of my wife, I give unto my son Clement Pace, one negro boy named Tom, and a man named Joe.

*Item 5th.* At the death of my wife, I give unto my son Stephen Pace, one man named Peter, and one boy named Burwell.

*Item 6th.* At the death of my wife, I give unto my son

John Pace, one negro man named Sam, and one negro boy named Ned.

*Item 7th.* At the death of my wife; I give unto my son Elkanah Pace, one negro man named Bartlett, and Amy and her youngest child, and Chany and her youngest child.

*Item 8th.* At the death of my wife, I give unto my daughter Elizabeth Weddington, one half of the lot of land she lives on, including the houses where she lives in, to be taken off of the upper end of said lot, joining Byers and my son John; also a negro woman named Tildy, and her children, and Isham and his wife.

*Item 9th.* I give unto Catharine May's children, formerly John May's wife, my daughter, Rose and her children, to be equally divided between Catharine's children.

*Item 10th.* At the death of my wife, I give unto Nancy Pace, son William's daughter, Judy a girl, and Ellick, a boy.

*Item 11th.* At the death of my wife, I give unto my daughter, Polly May's children, Philis and her children, to be equally divided between them, at the death of my daughter Polly May.

*Item 12th.* At the death of my wife, I give unto my daughter Lucy Burt's children, Martha and Mary, Dinah's two children, to be equally divided between them.

*Item 13th.* At the death of my wife, I give unto my grand daughter, Mary Petty, one negro girl named Caty.

*Item 14th.* The other negroes not given away, I leave with my wife, to dispose with as she thinks proper, amongst our living children, at her death or before.

*Item 15th.* I also appoint my wife, Polly Pace, executrix to this my last will, (alone) and at her death, for each of my sons to have equal powers as executors; that is, my living sons at that time. In witness whereof, I have hereunto set my hand and seal, this February 4th, 1847.

WILLIAM PACE, [L. S.]

Thomas Pace, et al.   vs.   John Mealing,

*Item* 16*th*.   At the death of my wife, should she fail to dispose of the negroes, as above empowered, I want my executors to sell them at public sale, if they can't divide them satisfactorily amongst themselves; I want the negroes to be divided between my five sons, William, Clemont, Stephen, John, and Elkanah, and no one else to bid at the sale, and no one else to share in the money arising from the sale of the negroes, if there should be a sale.   Signed by my own hand, this February the 4th, 1847.

WILLIAM PACE, [L. S.]

### Copy Will of William Pace.

In the name of God, Amen! I, William Pace, senior, of the county and State aforesaid, being in perfect mind and memory, but weak in body, and calling to mind the mortality of my body, and knowing that it is appointed for all men to die, do make and ordain this my last will and testament, as touching my worldly estate, whereof it hath pleased God to bless me with in this life. I give, and devise, and dispose of the same, in manner as follows:

*Item* 1*st*.   I give my soul to God that gave it, and desire my executrix and executors, to have my body decently buried, that it may return to dust from whence it came, according to the word of the Lord.

*Item* 2*d*.   I desire that all my property, of every description whatever, remain in the hands of my wife Polly Pace, during her natural life, and that she keep it together, as it now is, and as my just debts come due, that she pay them out of the profits arising from the same. At the death of my wife, I want the property, as I will it away, to fall into the hands of them I will it to, and for them to take it in possession, and the balance of my estate, of every description, not willed away, to be sold by my executors, at public sale, and divided between my living children—I mean them that are alive at that time, when the sale takes place.

*Item* 3*d*.   At the death of my wife, I give unto my son

William Pace, one negro man named Jack, and one boy named Frank, and

*Item 4th.* At the death of my wife, I give unto Clement Pace, one negro man named Joe, and one named Tom, and a boy named Phillip.

*Item 5th.* At the death of my wife, I give unto my son Stephen Pace, one negro named Peter, and a boy named Burwell.

*Item 6th.* At the death of my wife, I give unto my son John Pace, one negro man named Sam and one named Ned, Rose a girl.

*Item 7th.* At the death of my wife, I give unto my son Elkanah Pace, a negro man named Bartlett, and Amy, and her youngest child, and Lewis a boy.

*Item 8th.* At the death of my wife, I give unto my daughter Elizabeth Weddington, one half of the lot of land she lives on, to be taken off of the upper end of the lot, joining son John's land; also a negro man named Isham, and his wife Hester, and Tildy and her children.

*Item 9th.* I give unto Catharine May's children, formerly John May's wife, my daughter, Rose and her children, to be equally divided between Catharine May's children.

*Item 10th.* At the death of my wife, I give unto Nancy Pace, son William's daughter, Judy a girl, and Ellick a boy.

*Item 11th.* At the death of my wife, I give unto my daughter Polly May's children, Fillis and her children, to be equally divided between them, at the death of my daughter Polly May; and at the death of my wife, I give unto my daughter Polly May, one negro girl named Lucindy.

*Item 12th.* I give unto my daughter Lucy Burt's children, Martha and Mary, a negro woman Dinah, and her children, to be equally divided between them: and if any one of the girls should die without an heir of her body, the living one to take all.

*Item 13th.* At the death of my wife, I give unto Mary Petty, a girl named Caty.

*Item 14th.* I also appoint my wife, Polly Pace, executrix of this my last will (alone) and at her death, for each of my sons to have equal power as executors; that is, my living sons at that time, to-wit: William, Clement, John, Stephen and Elkanah. In witness whereof, I have hereunto set my hand and seal, this August 1st, 1847.

WILLIAM PACE, Sr. [SEAL.]

*Copy Will of Michael L. Dent father of Joseph Dent, introduced and read by Caveator.*

June 11th, 1847.

This my last will and testament. That after my decease, I be buried with a christian burial, such as becometh one that looks for reward in the merits of Jesus.

Art. 1. That my property be divided as follows: To my wife I give the lot of land whereon I now live, during her natural life. At her death to William H. Dent during his natural life.

2. I give my black woman Sophia to my wife, together with all the plantation tools, two cows and calves, one sow and shoats, pork hogs to make meat for one year, the household and kitchen furniture, my brood mare and colt, and sorrel mule; all the above bequest during her natural or single life; at her death to William Hatch for his support while he lives, and to be equally divided among the lawful heirs at his death.

3. I give to W. Hatch my colored man Billy, during his life time, and at his death to the lawful heirs, and appoint my son Joseph M. Dent guardian of the property and person of William Hatch.

4. I give to my daughter Mary S. Byers, my boy Mark, and to the lawful heirs of her body.

5. I give to my daughter Elizabeth Biggers, and to the lawful heirs of her body, my colored girl Lizzy.

6. I give to my daughter Margaret Ann Mullen, and to the heirs of her body, my girl Anne.

7. To my son Richard, my boy Leigh.

8. To Robert Lawson, my girl Lindy.

9. To John Michael Lawson Dent, my boy Allick.

10. To A. S. Dent, my boy David.

11. To my son Richard, in trust for Joseph M. during his natural life, my woman Lucy. Joseph M., William Hatch, and my wife, to receive theirs, without valuation; the balance of the above named legatees to receive theirs at valuation, so as to make them all equal, accounting for what they have received. The balance of my property to be sold together with my crop, and applied so far as it will go to make up the deficit of those that receive black ones of less value, and if not enough to make them equal, to be paid by them that have received those of more value, so that there shall be an equal division with the legatees, as this instrument directs; and I appoint my son Richard Dent my executor to carry out my wish without any administration. My last illness and burial expenses to be first paid.

Two hundred bushels of corn to be left on the place, with fodder enough to support for one year.

MICHAEL LAWSON DENT.

To the property given to John Michael Lawson Dent, I appoint my son Richard, guardian, the profits to be applied for his support and schooling, the principal to be kept untouched till he arrives at manhood. If he dies before that time, the property to return to my estate; and to John H. Dent's widow I give fifty dollars.

M. L. DENT.

The lot of land two hundred and six, to be sold to raise money to pay off them of the legatees that lack; Joseph M. Dent to be paid $100 for his services if he continues to save the crop.

M. L. DENT.

*Jesse Cox* re-introduced by *propounders,* testified, he heard

no such remark as that of the old lady, that the will read to her that night by the old man, cut out Stephen.

*Cross Examined.*—The remark might have been made and he not have heard it—did not pay particular attention, there were a good many people about.

*James G. Burt* re-introduced by *propounders*, heard no such remark as that testified to by Dent, as made by the old lady, that the will the old man read to her cut out Stephen.

*William Pace* for *propounders*, sworn, testified, he was present at the examination for a will, on Tuesday after the old man died. He heard several wills read, and when the will that disposed of Laney was read, the old lady said that was the last will.

*Newton Pruett* for *caveator*, testified by interrogatories, that on the 26th day of April, 1854, on Mr. Jacob Land's plantation, Mr. Jacob Land and one of his little sons about eight or ten years of age, and himself, were present, and Jacob Land said he did not know anything about the will of William Pace, senior, deceased; he never heard William Pace, senior, say anything about his will, and he Land, did not want to know anything about it; and he Land thought that Mr. Burt's children ought to have their share of their grand-father's estate as much so as any of the old man's children, and that he did not blame Burt for the course he was pursuing.

At Mr. Burt's, some time in the summer of 1848, he heard William Pace, senior, deceased, say he intended to do the same by Burt he did by his other children.

*Cross Interrogatories.*—1. No one was present or could have heard the conversation but those mentioned in the second direct interrogatory.

2. I was sent to Mr. Land's by Elkanah Pace, to buy some corn, and Land remarked or observed to me that Pace wanted to sell him a piece of land, which give rise to the conversation related in the second direct interrogatory which is all that I recollect of the conversation.

3. I happened to name it to one of his particular friends, not knowing that I would be called on to testify in the case. I did not know that I would be called on, till the interrogatories were presented to me. Mr. Burt and myself married sisters.

4. Has not been connected by blood or marriage with propounders.

5. Has not heard caveator say anything in favor of propounders.

*For propounders.*—Newton Pruett by interrogatories testified.

1. He knew the parties.

2. Knew William Pace, whose will is controverted in this case.

3. He gave his testimony in this case before by interrogatories, at the instance of caveator, just before the sitting of the Superior Court of Muscogee county, Georgia, in the Spring of 1854.

4. He was asked by former interrogatories, at the instance of caveator, to state all he knew to benefit caveator, and his answer was, according to the best of his recollection, that he heard William Pace, deceased, say to James Burt, that he would do by him as he done by others, or words to that effect.

5. The subject of conversation was between Burt and Pace, that Burt asked William Pace, deceased, for a board tree, which induced him to remark that he would do by him as he done by others. Pace granted him the board tree according to or at his request. This request and remark was made at Mr. Burt's house, in the year 1848.

6. He stated to Ralph Thompson, in Elkanah Pace's swamp or low ground cotton patch, about ten days after giving in his testimony before in this case, and in a few days after, between Elkanah Pace's saw mill and his dwelling house, that the remark above mentioned was made by William

Pace in answer to James Burt's request, that Pace would let him have a board tree. He did also state at such time and places to Ralph Thompson, that in taking his testimony on the occasion above referred to, the Commissioners took the above mentioned remark of Mr. Pace to Mr. Burt, but did not take down the explanation of it, which he gave them, as a part of his testimony.

*Cross Interrogatories.*—The only explanation given by Mr. Pace was, that he would give Burt a board tree, at Burt's request, as he had done by others, alluding to nothing but the board tree.

2. In the fifth direct interrogatory, he has answered what he did say in his own words.

Judge BENNING having been formerly of counsel in this case, did not preside.

WELLBORN JOHNSON & SLOAN; HINES HOLT. for plaintiffs in error.

THOMAS & DOWNING; and JONES & JONES, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

A verdict having been found, setting up the will propounded for probate in this case, a rule nisi was moved at the same Term, calling upon the successful party to show cause, so soon as counsel could be heard, why a new trial should not be granted, According to the practice of the Court, the argument would have been heard, and the decision made at the next ensuing Term. In order to expedite the cause, however, it was agreed that the application should be referred to the Court, without argument, and the judgment was to be sent to the Clerk within twenty days, to be entered as of the December Term, when the motion was made, More than

twenty days elapsed before the decision of the Judge, ordering a new trial, was received. This decision is excepted to, because it was not rendered within the time specified in the agreement.

We have no hesitation in holding, that the judgment cannot fail on that ground. Suppose the Judge had failed entirely to make up an opinion, the only effect would have been that the case would have stood over for a hearing at the next Term ; when according to usage, it was properly determinable. And that is the direction we should give this case, but for the request of counsel:—if that be the opinion of the Court, that this objection be considered as withdrawn.

Was the Court then so flagrantly wrong in granting a new trial, that we are constrained to interfere and control his discretion ?

This case is reported at great length in 14*th Geo. Rep.* p. 596. Upon a thorough and careful examination of all the testimony, we were then of the opinion that the presumption of law against a testamentary paper, disposing of real and personal estate, with an attestation clause not subscribed by witnesses, was not rebutted by the extrinsic evidence.

On the last trial, some additional proof was introduced. We must say, that it has not materially changed the aspect of the case, as before presented. Not one particle of it—indeed I might say with safety, not a particle of the evidence *ever* taken in this case, not even that of old Mrs. Pace herself, points necessarily to the particular will propounded, or to any other, except that the will propounded does show the interlineation as to Chaney. But a bare inspection of the paper will satisfy any one that this was not done when that instrument was written. It consists of the vague declarations of the testator respecting a disposition of his property by will, and we think a portion of that recently taken, makes against, rather than in favor of this will, and all taken together, to say nothing of the contradictory proof, fails to

supply the proper evidence, of final and complete execution.

I have said that the testimony of even old Mrs. Pace, fails to identify the will propounded for probate; she testifies that the will to which she refers was written in the summer of 1850. The will offered for probate, purports to have been written in February, 1847; she states that after he had written the will he read it over to her, to know if she was satisfied with it; her reply was, that as Laney was old, she would prefer her to stay with the children, rather than being sent to Alabama, and that immediately and according to her wish " he put out Laney and inserted Chaney in her place, and then disposed of Laney otherwise in another part of the will." (See answer of the witness to the 3d and 4th direct interrogatory, and to the 1st cross interrogatory.)

In addition to the discrepancy in dates, one has only to inspect this paper to be satisfied that the addition at the end relative to Laney, was written at the same time with the body of the will, while the substitution of Chaney in the place of another name erased, was with a different ink and pen. And that is not all, the same additional clause appears in another of the five wills found amongst the papers of the testator, also purporting to have been written in February 1847, but which, from appearances, in my humble judgment, is the youngest in the series. It is written on the same kind of paper, with the one propounded for probate, and the most correctly prepared of the whole.

If the will offered for probate, was written on the night to which Mrs. Pace swears, why, if his testamentary purpose was finished, this unattested attestation clause to this paper? This question never has been answered, either by proof or argument. I apprehend it never can be.

By reference to the five wills before the Court, this fact will be discovered, namely, that while the testator ever manifested the intention of having his will witnessed, yet he

was regardless of the location of the attestation clause. Take the will, for instance, which in my opinion, is the last of the five, at least, and the attestation clause " in the presence of us," to the addition or codicil, is immediately over the name of the testator, on the right hand side of the paper. I refer to this, in answer to the suggestion that the addition to the will propounded relative to Laney, is written immediately under the attestation clause, and the inference is, that it was intended to crowd out the signature of the witnesses. Not only does the foregoing fact, to which I have adverted, rebut this presumption, but I remark further, more emphatically, that in deeds and wills, and all other instruments, when anything is altered or written in the body of the instrument, it is usually inserted immediately under the attestation clause, to show that the attention of the subscribing witnesses was called to it before signing.

In commenting upon the testimony of old Mrs. Pace, in the former decision, the question was asked, " what fact or circumstance does she state, from which it could be inferred that the paper propounded was any more the will or wish of her husband, as to the personalty, more than to the realty ?" No answer has been given to that inquiry.

Jacob Land swears that he heard Mr. Pace speak of his purpose relative to the disposition of his property, at his death ; and he said that his business should be so arranged as that there should be no " jangling" when he died ; and that he intended all his land should be sold at his death ; and this was spoken, say counsel, from his consciousness of the fact, that his will, not being attested, would not dispose of his land. But why put it in his will ? What reason, I repeat, is there for supposing that he intended to die intestate as to his land, and testate as to his personal property ? Was he not too sensible a man, designedly, to make an ineffectual disposition of either ? The fact, that the land is in the will, repels the idea that he intended to die intestate as to that; and shows that his mind was not fully made up, as to either

land or personalty.   He knew that three witnesses to a will devising land, was necessary.   As early as 1832, he wrote a will to land, which was attested by three witnesses.   It is in proof, that he had acted as a magistrate for many years; that he was accustomed to draw deeds, bonds for titles, and other legal instruments; that he was a particular man in his business; that his attention had been directed to this very subject, (see Dent's testimony.)   But I forbear to extend these comments.   From the number of wills found, and under all the circumstances, a jury should hesitate long in setting up this particular paper, entirely unsupported, as it is, by the proof of final testamentary disposition.   It is just one of those cases, where, from the very nature of it, so much doubt and uncertainty exist, as to make it better to leave the estate to that equal division and distribution which the law makes, and which in ninety-nine cases out of every hundred, perhaps, is a better will than made by the testator.

Upon a re-examination of the whole case, I am better satisfied, than ever, with the conclusion to which we came when this case was up before.   The very fact that Mr. Pace made so many wills, while it establishes, that Mr. Pace did not intend, to die intestate; still it shows, conclusively, the unsettled state of his mind; and the truth of what he said to the witness, McCrary, the day before he died, that he was at a loss to know what disposition to make of his negroes, in order to do what was right and just.

But it is said that there have been two concurrent verdicts of special juries; and that therefore, the finding in this case should not be disturbed.   While this is literally true, yet it is not accurate for the purpose for which it is used.   The Ordinary pronounced for the will.   An appeal was taken to the Superior Court, and by the refusal of the presiding judge to charge the law of the case correctly to the jury, a verdict was returned, of course, for the will.   I say of course, for to their credit, be it spoken, that I discover, throughout the State, a

determination by the juries, to administer the law as given them in charge by the Courts. But the error of the Court was corrected and a new trial ordered; upon which a verdict has been rendered in favor of the will.

No one doubts either the integrity or the intelligence of the jury. The names of the foreman and the other members are a guaranty for both. But the facts of this case are so numerous, and the legal principle upon which it rests—namely: the difference between a paper sufficient in all its parts to pass property, and yet void for want of testamentary intention, that it should operate as it stood, without some further act to complete it—I repeat, this well settled doctrine, not being one of common occurrence, it is not strange that a mistake or oversight should have been committed in the application of this rule to the evidence. The jury may have been misled, as counsel have been, by the rule of law regulating this case, as laid down by this Court, and that is, that while it is true that the presumption of law is against a testamentary paper with an attestation clause, not subscribed by witnesses, yet the presumption is *slight*, provided the instrument be perfect in all other respects.

The principle thus stated, is not the only obstacle to the execution of the paper propounded as a will. Suppose this will had been duly attested, as was the will of 1832, it would be difficult, even then, to select this paper from the batch, and admit it upon the proof to record. So that the point which has been so elaborately discussed, is complicated with others of the gravest character. And it is only one out of the many reasons relied on to prevent this paper from going to probate; and yet sufficient of itself, had there been but one will, and that found under circumstances as to cast no suspicion of its validity, to exclude it from probate, unless the presumption against it from defective execution was rebutted by aliunde proof.

We doubt not the jury themselves would prefer to have

the cause sent back for their reconsideration. We feel it *our* duty to do so at any rate, and leave it to the co-ordinate branch of the Judiciary to discharge *theirs*, as we doubt not they will.

Judgment affirmed.